IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ELEVATE GROUP LLC, d/b/a )<br>ELEVATE TECHNOLOGY SOLUTIONS, )<br>            )<br>    Plaintiff,    )<br>            )<br>    v.        )<br>            )<br>AMYX, INC.,        )<br>            )<br>    Defendant.    ) | Civil Action No. 1:21-cv-48 (RDA/IDD) |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant/Counter-Plaintiff Amyx, Inc.'s ("Amyx") Motion for Judgment on the Pleadings. Dkt. 20. This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with Amyx's Memorandum in Support (Dkt. 21); Plaintiff/Counter-Defendant Elevate Group LLC's ("Elevate") Opposition (Dkt. 25); and Amyx's Reply (Dkt. 26), it is hereby ORDERED that Amyx's Motion for Judgment on the Pleadings (Dkt. 20) is DENIED.

### I.  BACKGROUND

#### A. Factual Background

Defendant Amyx is a Delaware corporation with a principal place of business in Reston, Virginia. Dkt. 1 ¶ 2. Plaintiff Elevate is a limited liability company whose members are all citizens of Massachusetts; its principal place of business is likewise in Quincy, Massachusetts. *Id.* ¶ 1. Elevate entered into a Master Subcontract Agreement ("MSA") with Amyx, Inc. in March of 2015. Dkt. 1-1. The provisions of that document form the basis of this lawsuit. Several months before Elevate and Amyx finalized that contract, they began discussing whether Amyx was interested in

bidding on work being offered by the Securities and Exchange Commission ("SEC") pursuant to a set of standards known as the Federal Acquisition Regulations ("FAR"). Elevate had relevant experience dealing with the SEC, while Amyx had a contract with the General Services Administration ("GSA"). The GSA contract permitted Amyx to bid on the SEC's Request for Proposal ("RFP") by gaining access to a particular applicant pool. Dkt. 1 ¶ 5. Because "Elevate had the requisite SEC experience, . . . Amyx was interested in Elevate's proposal." Dkt. 1 at 2. After some initial negotiation, Elevate and Amyx entered into a "Teaming Agreement" on August 25, 2014. Dkt. 1-1 ¶ 6. The following month, Amyx was awarded the SEC contract on September 23, 2014. *Id.* ¶ 8. The SEC and the parties refer to the contract as the "Prime Contract." *Id.*[1]

After the Prime Contract was awarded, the parties finalized the MSA on or about March 2, 2015. *Id.* ¶ 9. Amyx drafted the MSA. *Id.* ¶ 10. An initial Statement of Work ("SOW") numbered "0001" was attached to the MSA and covered work to be performed for the SEC Office of Compliance and Examinations ("OCIE"). Pointing to the numbering of this SOW, Elevate contends that the express stated purpose of the MSA was to enable Elevate to support not just this work for OCIE, but *all* work funded through the Prime Contract beyond this initial SOW. *See id.* ¶¶ 11-12. A provision in the MSA contemplates that Elevate would be able "to be considered for other contract positions." Dkt 1-1 ¶ 2. Titled "Allocation of Responsibility," that section states:

> During the term of this Subcontract, Amyx guarantees that Elevate's work-share during the life of the contract shall be at least 35 percent of the billable revenue, measured at the prime contract level. Subcontractor shall have the opportunity to provided [*sic*] staff to be considered for other contract positions.
>
> During the term of this Subcontract, Amyx guarantees that Elevate will provide the majority of all NYRO Staff; however, that in order for Amyx to maintain as least a senior billable staff member at the NYRO physical work location, Amyx may

---

[1] The contract is formally described as "Contract GS00Q14OADS103/Order No. SECHQ114F0200." Dkt. 1 ¶ 8.

2

>provide at least one SME Financial Analyst during each Option Year, as mutually agreed.

*Id*. Elevate also points to other provisions of the MSA that outline terms such as the process by which other work funded through the Prime Contract would be assigned to Elevate, the price of other work awarded through the Prime Contract, and the location for the work to be performed. *See id.* ¶¶ 2, 5.

During "Option Year 1" of the MSA, Elevate alleges it supported both the OCIE and the SEC's Office of Credit Reporting ("OCR"). Dkt. 1 ¶¶ 19, 23. Elevate further contends that the parties received funding and support requests from the SEC's Division of Enforcement ("Enforcement") during that first year. *Id.* ¶ 21. And in "Option Year 2," Amyx allegedly received about $14 million in funding from the SEC through the Prime Contract, which was meant to support work for OCIE, OCR, and Enforcement. *Id.* ¶ 24. This initial funding was soon followed by an additional $1,208,539 in funding, again through the Prime Contract. *Id.* Elevate alleges this additional sum included work for the SEC's Center for Risk and Quantitative Analytics ("CRQA"). *Id.*

In March of 2017, Elevate and Amyx learned that the SEC intended to remove work for OCIE from the Prime Contract. Dkt. 1 ¶ 26. Initially, Amyx and Elevate discussed whether they would again collaborate and submit a new proposal to the SEC's newly opened RFP process. *Id.* Ultimately, the proposed teaming agreement fell apart, and Elevate and Amyx separately responded to the SEC's RFP. *Id.* Both Elevate and Amyx were given awards, but neither OCIE nor the SEC ever placed any more significant work orders with either company. *Id.* Elevate alleges that Amyx then elected "to take for itself all remaining work funded through the Prime Contract and all future work funded through the Prime Contract." *Id.* ¶ 29.

The parties executed a second SOW on August 24, 2017. *Id.* ¶ 34. The document states that: "This Statement of Work Number 0002 is issued pursuant to the Subcontracted Agreement dated as of October 1, 2014." *Id.* The purpose of the modified SOW was "to de-scope the Statement of Work to include only support [OCR]"; the new SOW stated that it "will no longer support [OCIE] effective June 1, 2017." Dkt. 1-4 at 2. In October of 2017, Amyx allegedly sought to modify the MSA itself on the ground that the parties' modified SOW necessitated modification of the MSA itself. *Id.* ¶ 35. Specifically, Elevate alleges that Amyx sought to make three principal changes to the MSA. First, Amyx was interested in changing the allocation of Elevate's revenue share—which had been defined as "35 percent of the billable revenue, measured at the prime contract level"—to instead be set at "a maximum of 70% of labor revenue for any work that Elevate brings to the Contract." *Id.* ¶ 37. Second, Amyx wanted to remove from the MSA entirely the provision stating that Elevate "shall have the opportunity to provided [*sic*] staff to be considered for other contract positions." *Id.* ¶ 38. And third, the proposed modified MSA included a provision "which attempted to completely bar Elevate from communicating at all with the SEC." *Id.* ¶ 40. In the end, negotiations to modify the MSA failed, and the MSA was never modified. *Id.* ¶ 42.

Elevate alleges that the Prime Contract was extended on September 3, 2020, to include funding in 2021. *Id.* ¶ 44. Elevate further alleges that Amyx has continued to perform work for OCR, Enforcement, and CQRA but has excluded Elevate from that work, thereby violating the parties' MSA. *Id.* ¶ 43. In support, Elevate points to the MSA's "Option to Extend" provision, which states in part that "[i]n the event the Prime Contract is extended, then the Subcontract will be extended and all of the terms, conditions, and covenants of this Subcontract shall continue in full force and effect unless amended in writing by both parties . . . ." *Id.* ¶ 44 (citing Dkt. 1-1 ¶ 4).

4

Elevate raises another set of allegations against Amyx's hiring of Jeffrey Meyer, who was Elevate's subcontractor under the MSA. *Id.* ¶¶ 45-65. On July 11, 2017, Elevate subcontracted with Meyer, who serves as the principal of a company known as DataScience.Codes LLC ("Datascience"), to support the Prime Contract as a quantitative analyst for OCR. *Id.* ¶¶ 46-47. Meyer continued working in this role until October of 2020. *Id.* ¶ 48. Elevate alleges that Amyx later solicited and directly hired Datascience and Meyer, without publicly recruiting for the position, in violation of the non-solicitation provision of the parties' MSA. *Id.* ¶¶ 45, 49, 57.

According to Elevate, Amyx "hire[d] DataScience/Meyer out from under Elevate" after having a series of covert discussions that involved the exchange of price terms and other terms from the MSA and Subcontract Agreement. *Id.* ¶¶ 51-52. Amyx, along with Datascience and Meyer, then used this improperly obtained information to negotiate terms, which Elevate alleges constituted a breach of the MSA. *Id.* ¶ 52. Datascience and Meyer are purportedly performing the same work for Amyx—including supporting the Prime Contract in the substantially same manner—that Meyer previously performed for Elevate. *Id.* ¶ 55. By soliciting Datascience, Elevate alleges that Amyx stole Elevate's expertise and undermined Elevate's ability to demonstrate recent, relevant experience when responding to future RFPs from the SEC. *Id.* ¶ 56.

Furthermore, Elevate alleges that beginning in August of 2020, the company tried to determine whether the Prime Contract was going to be extended past its anticipated September 30, 2020 end date, as well as whether DataScience and Meyer would be retained. *Id.* ¶ 59. Amyx, allegedly wanting to deceive Elevate into believing the Prime Contract would not be extended, instructed Datascience and Meyer to keep secret that the Prime Contract was being extended and that Datascience and Meyer would indeed be retained. *Id.* ¶¶ 60-61. Elevate alleges that Amyx owed Elevate a contractual obligation to inform Elevate that the SEC had exercised its option to

5

extend the Prime Contract past September 30, 2020, but that Amyx instead made repeated false and misleading statements in an effort to evade this contractual duty. *Id.* ¶¶ 64-65. In support, Elevate cites a number of communications between Elevate and Amyx, as well as communications between Elevate and Meyer, between August 21, 2020 and November 5, 2020. *Id.* ¶ 65. These communications detail Elevate's repeated efforts to obtain information about the status of the Prime Contract and Amyx's evasive conduct in response. *Id.*

### B. Procedural Background

On January 15, 2021, Elevate filed suit in this Court, bringing claims for breach of contract, interference with contract, statutory conspiracy, and common law conspiracy. Dkt. 1. Later that same day, Amyx separately filed suit in this Court, seeking relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, seeking declarations from the Court on "Amyx's Right Not to Negotiate and Subcontract New Services to Elevate" and "Amyx's Right to Employ [Bradley] Meyer"—whose company was purportedly a subcontractor to Elevate in support of Amyx's Prime Contract with the SEC. *See Amyx, Inc. v. Elevate Group LLC*, No. 1:21-cv-50 (E.D. Va. 2021). On February 16, 2021, the Court consolidated the two actions. Dkt. 12.

Elevate then moved to dismiss Amyx's Declaratory Judgment Complaint. Dkt. 13. Amyx opposed that motion, and this Court denied the motion to dismiss on September 30, 2021. On June 22, 2022, the parties stipulated that Elevate's claims for interference with contract (Count II); Elevate's claim for statutory conspiracy (Count III); Elevate's claim for common law conspiracy (Count IV), and certain portions of Elevate's claim for breach of contract (Count I) should be dismissed. Dkt. 39. The parties agree that Count I should be dismissed to the extent that the claim arises out of "an alleged violation of Section 31 of the parties' Master Subcontract Agreement as that provision relates to Amyx and DataScience.codes, LLC and Bradley Meyer." *Id.* at 1. This

stipulation does not affect any other alleged breaches raised in Elevate's complaint, and those alleged breaches constitute the theory of relief advanced in Count I of the Complaint. *Id.* at 1-2.

## II. STANDARD OF REVIEW

From the outset, it is important to note that the disposition of this motion implicates Rule 12(c) of the Federal Rules of Civil Procedure, not Rule 12(b)(6). Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." The standard of review for Rule 12(c) motions is the same as the "plausibility standard" governing Rule 12(b)(6) motions. *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014); *Travelers Indem. Co. of Connecticut v. Lessard Design, Inc.*, 321 F. Supp. 3d 631, 635 (E.D. Va. 2018). A motion for judgment on the pleadings challenges a claim's sufficiency; "it does not resolve disputes over factual issues, the merits of a claim, or the applicability of a defense." *SunTrust Mortg., Inc. v. Simmons First Nat'l Bank*, 861 F. Supp. 2d 733, 735 (E.D. Va. 2012) (citing *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). Thus, "judgment should be entered when the pleadings, construing the facts in the light most favorable to the non-moving party, fail to state any cognizable claim for relief[.]" *O'Ryan v. Dehler Mfg. Co.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000).

## III. ANALYSIS

The Court must first review the applicable law of the forum in which the claim arises. It is a fundamental principle that a federal court presiding over a case with jurisdiction via the diversity statute, as here, is obliged to apply the substantive law directed by the forum's choice-of-law rules. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *see also Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Virginia's choice-of-law rules apply the *lex loci contractus* rule whereby the law of the state where the contract was formed governs. *Woodson v.*

*Celina Mut. Ins. Co.*, 211 Va. 423 (1970). The place of contracting "is determined by the place where the final act necessary to make the contract binding occurs." *O'Ryan v. Dehler Mfg. Co.*, 99 F. Supp. 2d 714, 718 (E.D. Va. 2000). Here, the parties appear to agree that the place of contracting was Virginia. Absent evidence to the contrary, this Court agrees and finds that Virginia principles of contract interpretation apply.

Amyx seeks judgment on the pleadings as to Elevate's breach-of-contract claim. "The elements of a breach of contract are: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *MCR Fed., LLC v. JB&A, Inc.*, 294 Va. 446 (2017) (quoting *Filak v. George*, 267 Va. 612, 594 (2004)). In support of its motion, Amyx argues that (1) the parties had a mere agreement to agree; (2) the MSA's 35 percent workshare guarantee did not apply to non-OCIE work; (3) Amyx's obligations under the contract had expired; and (4) Amyx was not precluded from contracting with Datascience or Datascience's employee, Bradley Meyer. The Court takes each argument in turn.

    A. Whether the MSA's "Other Contract Positions" Provision Constitutes an Enforceable Contract Obligation

The Court must first determine whether Elevate plausibly alleges that Amyx was under any legally enforceable obligation with Elevate to begin with. For a contract to be enforceable, "there must be mutual assent of the contracting parties to terms reasonably certain under the circumstances." *Allen v. Aetna Cas. & Sur. Co.*, 222 Va. 361, 364 (1981). A mere agreement to agree cannot be enforced as a contract. No party disputes this rule, nor could they given the booming tenor of Virginia contract law on this point. *See, e.g.*, *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 490 (E.D. Va. 2002) (acknowledging that it is "well settled under Virginia law that agreements to negotiate at some point in the future are

8

unenforceable"); *W.J. Schafer Assocs., Inc. v. Cordant, Inc.*, 254 Va. 514 (1997). Even so, another interpretive principle counsels against "declaring contracts void for indefiniteness and uncertainty." *Blevins v. Booker*, No. 1:17CV00012, 2017 WL 2389720, at *4 (W.D. Va. June 1, 2017). Courts applying Virginia contract law generally hesitate to deem a contract unenforceable except in cases "where the indefiniteness [] reach[es] the point where construction becomes futile." *Id.* (stating that "invalidating a contract on the ground that it is indefinite should be a last resort").

In determining whether the MSA is insufficiently definite such that its "other contract positions" provision cannot be treated as an enforceable contract and instead must be read as a mere agreement to agree, "the Court considers whether the document at issue includes the requisite essential terms, and also whether the conduct of the parties and the surrounding circumstances evince the parties' intent to enter into a contract." *Comm 2006–C8 Coveside Lane, LLC v. Empirian Chesapeake, LLC*, No. 2:12-cv-373, 2013 WL 12138899, at *4 (E.D. Va. Aug. 23, 2013). The pleadings allege—and at this point the Court is dealing simply with allegations—that the "nature and scope" of the document is the work funded by the SEC through the Prime Contract. The MSA provides for "compensation" by allocating the 35 percent workshare. The place of performance is alleged to be the SEC offices. The duration of the agreement is until the MSA is completed. Aside from these essential terms, Elevate raises allegations regarding the parties' conduct and surrounding circumstances to support an inference that the MSA's "other contract positions" provision constituted a binding contract. The parties appear to have operated without confusion as to the terms, the responsibilities, the work to be performed, and the method of determining compensation when it came to OCR work. Elevate also alleges that Amyx at one time sought to exclude the "other contract positions" provision from the contract. Among the plausible

9

inferences that might be drawn from this allegation is that Amyx understood the provision to create an obligation to share in "other contract positions" at the 35 percent level.

Amyx's argument hinges largely on this Court's ruling in *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 939 F. Supp. 2d 572 (E.D. Va. 2013), in which the Court held unenforceable a "Second Teaming Agreement" because it was a mere agreement to agree. In Amyx's telling, this case is on all fours with *Cyberlock*, and the Court's decision in that case therefore dictates the result in this one. In opposition, Elevate distinguishes *Cyberlock*, pointing to the parties' own description of the document in question in that case, their course of dealing, and the interplay between the contract as a whole and a specific reference to the parties' anticipated future agreement about workshare percentage. The facts presented in *Cyberlock*, while perhaps distinguishable in some important ways from this contract dispute, appear to generally track the facts of this case.

Having relied so heavily on *Cyberlock*, Amyx is surely aware that the procedural posture of that case is instructive here too. Importantly, Amyx's briefing in support of its motion for judgment on the pleadings cites exclusively to the Court's summary judgment ruling in *Cyberlock*. *See* Dkt. 21 at 2, 10, 13; Dkt. 26 at 1, 3, 4, 7, 12, 15. But summary judgment was not the first time the Court analyzed the contract breach claim in that case. At the motion-to-dismiss stage, that Court *declined* to dismiss the contract-breach claim, which the defendant argued on the grounds the contract was insufficiently definite. The Court stated "that Cyberlock has plausibly demonstrated that the parties intended to be bound by the Teaming Agreement and has thus sufficiently alleged a breach of contract claim for purposes of surviving a motion to dismiss." *Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 876 F. Supp. 2d 672, 679 (E.D. Va. 2012). The Court unmistakably signaled that the procedural posture of the case—a dispositive motion brought at the pleading stage—figured prominently in its analysis of the contract-breach claim. *See id.*

("The Court declines to find, *at this early stage of the litigation*, that the Teaming Agreement lacked the essential elements of a contract.") (emphasis added); *see also id.* at 680 ("As such, the Court concludes that Cyberlock has adequately stated a breach of contract claim for purposes of surviving IE's Motion to Dismiss."). And after reciting the lessons gleaned from relevant authority, the Court observed "that the enforceability of a teaming agreement is a fact-dependent question and thus ill-suited for resolution on a motion to dismiss." *Id.* at 680.

Amyx urges this Court to follow *Cyberlock*, and the Court concludes that *Cyberlock* is indeed instructive here. Of course, the relevant *Cyberlock* opinion arose on a Rule 12(b)(6) motion, and this opinion resolves a Rule 12(c) motion; both motions seek to dismiss a complaint when, after "accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Priority Auto Grp., Inc. v. Ford Motor Co.*, 757 F.3d 137, 139 (4th Cir. 2014) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). Although a Rule 12(c) motion differs from a Rule 12(b)(6) motion in ways that are not relevant here, the Fourth Circuit has made clear that "the standard for Rule 12(c) motions is the same as applied to Rule 12(b)(6) motions." *Id.* In sum, *Cyberlock* teaches that where the enforceability of a particular contract provision turns not only on contract interpretation principles but on a fact-intensive review of "the facts and circumstances surrounding the teaming agreement," *Cyberlock*, 876 F. Supp. 2d at 680, the parties must be given the opportunity to test their theories and defenses through the crucible of discovery.[2] The parties

---

[2] In a passage that underscores the functional similarities between a Rule 12(c) motion and a Rule 12(b)(6) motion, this Court has stated that "[a] Rule 12(c) motion for judgment on the pleadings therefore is also analyzed for compliance with the Supreme Court's holdings in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)." *Cont'l Cas. Co. v. AWP USA Inc.*, No. 3:19-cv-661, 2021 WL 1225968, at *11 (E.D. Va. Mar. 31, 2021)

11

to this litigation will now proceed to discovery; to dismiss Elevate's contract-breach claim on the basis that it is a mere agreement to agree would deprive the parties of that opportunity.

2. Applicability of the MSA's 35 Percent Workshare Guarantee

Next, Amyx argues that the Court should grant judgment on the pleadings because the MSA's 35 percent workshare guarantee did not apply to any work performed for SEC components other than OCIE. Elevate alleges that Amyx has continued to support the SEC with respect to other divisions but has excluded Elevate from that work, which violates the MSA. Dkt. 1 ¶ 43. In addition, Elevate contends that the MSA required Amyx to give Elevate the opportunity to provide "other contract positions" measuring at least 35 percent of the prime contract's billable revenue. *Id.* ¶ 14. According to Amyx, this argument is misplaced because when the parties executed the MSA, the Prime Contract did not expressly provide for any work other than work to be performed for OCIE. Section 2 of the MSA states that the "Subcontractor shall have the opportunity to provide[] staff to be considered for other contract positions." Dkt. 1-1 at 2. Calling this a "separate aspirational provision," Amyx argues that the parties did not agree that the 35 percent workshare provision applied to all of Amyx's revenue under its Prime Contract vehicle with the SEC.

While this reading of the contract might hold some persuasive force, it is not the only plausible reading. The two relevant sentences appear one after the other in the same provision of the MSA, suggesting they should be read together. Because the whole-text canon "calls on a judicial interpreter to consider the entire text, in view of its structure and of the physical and logical

---

(quoting *U.S. v. Sum of Three Hundred Nine Million Five Hundred Thousand Dollars*, 85 F. Supp. 3d 111, 115 (D.D.C. 2015)). Other courts have observed that "[t]he only difference between the two motions is the timing—a 12(b)(6) motion comes before an answer is filed and a 12(c) motion comes after the pleadings are closed—otherwise the motions are functionally identical." *NextEngine Ventures, LLC v. Lastar, Inc.*, No. SACV1300463BROJPRX, 2014 WL 12581777, at *2 (C.D. Cal. June 3, 2014) (quoting *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989)).

relation of its many parts," *Dreher v. Experian Info. Sols., Inc.*, No. 3:11-cv-624, 2014 WL 2800766, at *3 (E.D. Va. June 19, 2014) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012)), the Court reads the 35 percent workshare guarantee provision together with the "other contract positions" provision of the MSA. It is at least plausible that the 35 percent workshare guarantee that applies to OCIE would inform the pecuniary arrangement for work performed under the same Prime Contract for other SEC components. As a result, the Court declines to grant judgment on the pleadings based on this theory.

### 3. Whether the MSA had Expired

Amyx next seeks judgment on the pleadings on the ground that its obligations under the contract had expired. According to Amyx, the MSA was never extended, and Elevate's claim alleging breach after the end date of the MSA means that Elevate's claim is barred. The Court looks to the MSA's "Option to Extend" provision, which states that

> AMYX shall have the unilateral option to extend this Subcontract in the event additional services are required or if the Customer exercises any option to extend the Prime Contract. In the event the Prime Contract is extended, then the Subcontract will be extended and all of the terms, conditions, and covenants of this Subcontract shall continue in full force and effect unless amended in writing by both parties and, if required under the Prime Contract approved by Customer.

Dkt. 1-1 at 2. This provision makes extension of the MSA contingent on the extension of the Prime Contract. Elevate alleges that the Prime Contract was in fact extended. Dkt. 1 ¶ 71. The Court takes this allegation as true, as it must at this stage of litigation. *See, e.g.*, *Clarke v. Harleysville Mut. Cas. Co.*, 123 F.2d 499, 500 (4th Cir. 1941) (affirming this standard as applied to motions for judgment on the pleadings); *United States v. 2001 Lexus LS430 VIN JTHBN30F910017797*, 799 F. Supp. 2d 599, 601 (E.D. Va. 2010) ("[I]n a 12(c) motion, all facts asserted in the complaint must be taken as true and all reasonable factual inferences must be drawn

13

in favor of the plaintiff." (citing *Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002))). Consequently, Elevate has plausibly pleaded that Amyx's contractual duties under the MSA continued when the Prime Contract was extended. The Court therefore declines to grant judgment on the pleadings on the basis that the parties' contract had purportedly expired.

### 4. Applicability of the MSA's Non-Solicitation Provision

Finally, Amyx asserts that the company was not precluded from contracting with Datascience or Meyer. The parties wrote into their contract a restrictive covenant prohibiting the solicitation of each other's personnel:

> Neither party shall knowingly solicit, recruit, hire or otherwise employ or retain any employee, agent, consultant, officer or representative of the other party, performing under this Subcontract or the Prime Contract, during the Term of this Subcontract and for one (1) year following the termination or expiration of this Subcontract, without the prior written consent of the other party.

Dkt. 1-1 at 11. Amyx argues that this restrictive covenant in Section 31 applies to employees, agents, consultants, officers, and representatives of Elevate, but not to subcontractors or independent contractors like Datascience. Notably, Amyx cites no case law for the proposition that an independent contractor cannot act as a party's "consultant" or "representative." Without ample authority supporting that result, this Court remains unpersuaded that judgment on the pleadings may be granted on such a one-dimensional reading of the restrictive covenant.

What is more, the text of the MSA calls into question this narrow reading of the "any employee, agent, consultant, officer or representative of the other party" language. A provision of the MSA titled "Personnel" pertaining to "Any Subcontractor Personnel" establishes that the "Subcontractor shall be responsible for verifying the education and work experience of any employee, agent or representative ('Personnel') assigned to perform work under this Subcontract and shall provide AMYX with written or electronically proof of such verification." Dkt. 1-1 at 5.

14

This provision suggests that the MSA itself defines a representative of the subcontractor—i.e., Elevate—as "Personnel" for whose qualifications Elevate was responsible for verifying. If Datascience was not a "representative" of Elevate, then Elevate would not have had supervisory authority over verifying the education or work experience of Datascience. But the MSA states otherwise, further undercutting the suggestion that judgment on the pleadings should be granted on Elevate's breach-of-contract claim.

## IV. CONCLUSION

For the reasons stated above, it is hereby ORDERED that Defendant/Counter-Plaintiff Amyx, Inc.'s Motion for Judgment on the Pleadings (Dkt. 20) is DENIED; and it is

FURTHER ORDERED that Plaintiff/Counter-Defendant Elevate's Motion for Local Civil Rule 16(B) Scheduling Order (Dkt. 33) is GRANTED. The Court will issue a Scheduling Order following the entry of this Memorandum Opinion and Order.

It is SO ORDERED.

Alexandria, Virginia
August 30, 2022

/s/
Rossie D. Alston, Jr.
United States District Judge